Argued and submitted December 12, 2019, reversed and remanded
September 9, 2021

CITY OF PORTLAND,
*Plaintiff-Respondent,*

*v.*

RODOLFO SANCHEZ GONZALEZ,
*Defendant-Appellant.*

Multnomah County Circuit Court
17CR66730; A167724

499 P3d 95

Defendant appeals from a judgment of conviction for violating a provision of the Portland City Code that criminalizes possession of a loaded firearm in public. He argues that the trial court erred in denying his motion to suppress, because officers exceeded the scope of the traffic stop when an officer went around the corner to investigate where defendant parked his car while another officer continued processing the traffic stop. *Held*: Because officers impermissibly investigated defendant for crimes other than the traffic violations without any independent constitutional justification, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

Leslie G. Bottomly, Judge.

Nora E. Coon, Deputy Public Defender, argued the cause for appellant. Also on the briefs were Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

YoungWoo Joh argued the cause for respondent. On the brief was Denis M. Vannier.

Before Lagesen, Presiding Judge, and Powers, Judge, and Landau, Senior Judge.

POWERS, J.

Reversed and remanded.

**POWERS, J.**

In this criminal case, defendant appeals from a judgment of conviction for violating a provision of the Portland City Code that criminalizes possession of a loaded firearm in public. He argues that the trial court erred in denying his motion to suppress. The trial court concluded that there was no unlawful extension of a traffic stop under the unavoidable lull doctrine when an officer went around the corner to investigate where defendant parked his car while another officer continued processing the traffic stop. After briefing but before oral argument in this case, the Supreme Court decided *State v. Arreola-Botello*, 365 Or 695, 451 P3d 939 (2019), which abrogated this court's longstanding unavoidable lull doctrine. Following that decision, we conclude that the trial court erred in denying defendant's motion to suppress because there was no independent constitutional justification for the officer's investigative activity that exceeded the scope of the traffic stop. Accordingly, we reverse and remand.

We review the denial of a motion to suppress for legal error and, in so doing, we are bound by the trial court's factual findings if there is any constitutionally sufficient evidence in the record to support them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017). To the extent that the trial court did not make express findings regarding disputed facts, we will presume that the court found the facts in a manner consistent with its ultimate conclusion, provided that the evidence would support such findings. *Id.* at 166. We set out the facts consistent with those standards.

During the fall of 2017, Sergeants Wilbon and Duilio of the Portland Police Bureau were patrolling in outer Northeast Portland. During their patrol that night, they encountered Rizell, a man who Wilbon knew had gang affiliations from their previous encounters. As the officers were talking to Rizell, defendant drove up in a white Subaru. Wilbon noticed that the windows were tinted in such a way that he believed violated the vehicle code. Rizell said, "That's my ride." Defendant stopped the car, backed up, and drove away. Rizell then remarked, "Well, that was

my ride and now he's gone," and the officers resumed their conversation.

Defendant parked around the corner and then proceeded to walk toward the group. Wilbon thought it was odd that defendant acted as though he was "going to just walk right past" them. He asked defendant why he had parked around the corner rather than use the open spots right next to where the officers were talking with Rizell. Defendant replied that he "just wanted to avoid the police and avoid what was going on." Wilbon, who was concerned by defendant's answer, responded, "Well, there's all this parking and then you're trying to avoid us. I mean you walked up on foot within feet of us." Wilbon then asked defendant for his name and, instead of verbally responding, defendant handed over his driver's license. Defendant consented to a records check, which revealed that defendant had a suspended license and did not have a concealed carry permit.[1]

Wilbon asked defendant for consent to go around the corner to search his car. Wilbon testified at the suppression hearing that he believed that defendant parked around the corner "with the intent to conceal or avoid police from detecting anything criminal." He told defendant, "I think you parked around the [corner] because there's probably something illegal in your car. And, I want to go find that out." Defendant initially agreed to the search, but quickly withdrew his consent.

At that point, Wilbon explicitly told defendant that their encounter had become a traffic stop. That is, right after defendant rescinded his consent, Wilbon told defendant, "Okay, well now it's a stop." Wilbon told defendant that Duilio was going to conduct a traffic investigation, and that, while Duilio was conducting the traffic investigation, he was going to jog over to defendant's vehicle to look inside. Wilbon testified that he went to the car "to see if there was something illegal *** in view."

Using his flashlight, Wilbon looked through the car windows and saw the handle of a firearm. He radioed

_____

[1] Although the record is unclear, the parties appear to agree that the officers learned that defendant did not have a concealed carry permit after performing the records check.

Duilio and other officers at the scene to detain defendant for possessing a firearm in the city. After being *Mirandized*, defendant admitted that the firearm was his, that he had purchased it two days prior, and that it was loaded.

Defendant was charged with violating section 14A.60.010 of the Portland City Code (PCC). That provision, entitled "Possession of a Loaded Firearm in a Public Place," provides, in part:

> "A.   It is unlawful for any person to knowingly possess or carry a firearm, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the firearm.

> "B.   It is unlawful for any person to knowingly possess or carry a firearm and that firearm's clip or magazine, in or upon a public place, including while in a vehicle in a public place, recklessly having failed to remove all the ammunition from the clip or magazine."

PCC 14A.60.010.

Defendant moved to suppress evidence gathered from the stop. Defendant argued that he was unlawfully seized when Wilbon took his driver's license and that his car was unlawfully searched because there was no reasonable suspicion of a crime. Defendant asserted that "if an infraction or violation has occurred, you cannot search for other evidence [that is not] reasonably related to that infraction or violation." In response, the prosecutor argued that Wilbon discovered the firearm during an unavoidable lull and further argued that Wilbon would have inevitably discovered the firearm.

The trial court rejected defendant's arguments and also rejected the city's inevitable discovery argument. In announcing its ruling from the bench, the court concluded that "this was not a stop until Sergeant Wilbon said, 'This is a stop.'" The court also concluded that, while Duilio was conducting the traffic investigation, Wilbon ran around the corner to investigate further because he believed that defendant was hiding something. The court explained:

> "Wilbon ran to where he believed the car was. Located the car, looked through the windows. Used his flashlight,

illuminating through the window. He did not touch the car. He needed the flashlight to help him see in the car. He could see parts of a—a gun, a firearm in the center console under the radio den.

"He concluded it was a firearm. Checked that there was no concealed carry. And, at that point they put [defendant] in custody."

The trial court also noted that Wilbon testified that he did not believe that he had probable cause to search the vehicle and found that running around the corner to see the firearm through the window took Wilbon about 30 seconds. The court concluded that there was no unlawful extension of the stop given the short time it took Wilbon to see the firearm through the windows and that Wilbon did not search the vehicle when he saw the gun through the windows. After the trial court denied his motion to suppress, defendant waived his right to a jury, proceeded to a bench trial, and was found guilty. He then initiated this timely appeal.

On appeal, defendant assigns error to the denial of his motion to suppress. After briefing was submitted in this case, but before oral argument, the Supreme Court decided *Arreola-Botello*, which abrogated the unavoidable lull doctrine. In a memorandum of additional authorities, defendant argues that Wilbon exceeded the scope of a traffic stop without any independent constitutional justification, which is required by Article I, section 9, of the Oregon Constitution.[2] Defendant argues:

"Wilbon told defendant that the encounter was now a traffic stop and that [Duilio] was 'going to do the traffic investigation for looking into the suspension, looking to any driving related stuff.' [Wilbon] told defendant, 'I think you parked around the [corner] because there's probably something illegal in your car. And, I want to go find that out.' At that moment, Wilbon engaged in investigative questioning and investigative activity beyond the scope of the traffic stop under *Arreola-Botello*."

We agree with defendant's argument.

---

[2] Article I, section 9, provides, in part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

As the Supreme Court has explained, under Article I, section 9, "all investigative activities, including investigative inquiries, conducted during a traffic stop are part of an ongoing seizure and are subject to both subject-matter and durational limitations." *Arreola-Botello*, 365 Or at 712. In abrogating the unavoidable lull doctrine, the court emphasized that officers' activities during a traffic stop must be reasonably related to the purpose of the traffic stop or be supported by an independent constitutional justification. *Id*.

When Wilbon went around the corner to investigate defendant's vehicle, he was expressly not investigating the suspended license, window tint, or any traffic violation, rather he was looking for something other than the traffic infractions. As Wilbon testified at the suppression hearing, he thought "there's probably something illegal in [defendant's] car. And, I want to go find that out." By investigating "something illegal" during the ongoing traffic stop without having articulated an independent constitutional justification, Wilbon impermissibly exceeded the scope of the subject-matter limitations under the state constitution.[3]

We further reject, as explained below, the city's argument that there was an independent constitutional justification for Wilbon to walk around the corner to investigate defendant's car for "something illegal." We assume without deciding that Wilbon's inspection of the car would need to be justified by reasonable suspicion at a minimum; the city does not suggest that a lower standard would apply.[4]

---

[3] In this case, there is no dispute that Wilbon's investigation of the vehicle was part and parcel of the traffic stop. That is, despite his disclaimer, there is no dispute in this case that his investigation during the traffic stop was part of the ongoing seizure and therefore subject to the subject-matter and durational limitations of a traffic stop. *See, e.g.*, *State v. Escudero*, 311 Or App 170, 173, 489 P3d 569 (2021) (applying *Arreola-Botello* and reiterating that all investigative activities—including deploying a drug-detection dog—conducted during a traffic stop are part of the ongoing seizure such that both subject-matter and durational limitations exist under Article I, section 9). Our holding is limited to that context, and we are not called upon to address whether an investigation similar to Wilbon's would violate the subject-matter limitations recognized in *Arreola-Botello* if the facts allowed for the conclusion that the investigation was not considered to be part of the stop.

[4] Although the issue is not before us, we note that Wilbon's use of a flashlight may have resulted in a search of the car, giving rise to the possibility that

The city has not pointed us to any specific and articulable facts in this record that defendant had committed a specific crime or type of crime or that he was about to commit a specific crime or type of crime. *See Maciel-Figueroa*, 361 Or at 182-84 (outlining requirements for reasonable suspicion); *State v. Walker*, 277 Or App 397, 401, 372 P3d 540, *rev den*, 360 Or 423 (2016) (noting that law enforcement may not "interfere with [a] person's liberty based only on intuition or a hunch"; rather, an officer must reasonably suspect the person of past, current, or imminent criminal activity). As an initial matter, Wilbon acknowledged that Duilio was processing the traffic violations and Wilbon explicitly was not investigating the potential window-tint violation. Thus, the city is left with defendant parking around the corner to avoid law enforcement, Rizell having known gang affiliations, combined with Wilbon's hunch that there was something illegal in defendant's car. Considering the totality of the circumstances, we conclude that Wilbon lacked objective reasonable suspicion.

First, "a person's legal efforts to avoid being stopped by or questioned by the police" contributes "little, if anything, toward a reasonable suspicion of criminal activity." *State v. Espinoza-Barragan*, 253 Or App 743, 750-51, 293 P3d 1072 (2012). The same principle applies when a person parks some distance from police before approaching them. Thus, the fact that defendant parked around the corner, rather than near the officers who were talking with Rizell, provides little support for the city's argument. Second, although Wilbon testified about Rizell's background and Rizell said that defendant was his ride, that evidence is not sufficiently particularized to give rise to any reasonable suspicion about defendant. *See State v. Kreis*, 365 Or 659, 665, 451 P3d 954 (2019) (explaining that "[a]n officer's suspicion must be particularized to the individual based on the individual's own conduct"). Third, without any other specific and articulable facts to support objective reasonable suspicion, Wilbon's

_____

probable cause was required. *See State v. Peek*, 310 Or App 587, 592-93, 485 P3d 292 (2021) (discussing circumstances in which use of a flashlight constitutes a search for purposes of Article I, section 9); *see also State v. Reed*, 169 Or App 456, 463, 9 P3d 738 (2000) (concluding that an officer's use of a flashlight to illuminate the contents of a film canister revealed something that was not in plain view).

belief that criminal activity was afoot—which was informed by his training and experience—does not tilt the scales in the city's favor. As we have explained, an officer's training and experience may help an officer interpret a specific and articulable fact, but training and experience is not, in and of itself, a specific and articulable fact that can provide the "something more" to establish reasonable suspicion. *See State v. Schmitz*, 299 Or App 170, 178, 448 P3d 699 (2019) (so stating). Although it is true that defendant parked around the corner because he wanted to avoid law enforcement contact, that fact—even when combined with Wilbon's training and experience—does not rise to the level of objective reasonable suspicion of criminal activity. *See State v. Daniels*, 234 Or App 533, 541, 228 P3d 695, *rev den*, 349 Or 171 (2010) (observing that an officer's training and experience "is not a magical incantation with the power to imbue speculation, stereotype, or pseudoscience with an impenetrable armor of veracity").

Accordingly, because Wilbon impermissibly investigated defendant for crimes other than the traffic violations without any independent constitutional justification, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.